MAYER, Circuit Judge,
dissenting.
I respectfully dissent. There can be no infringement of U.S. Patent No. 6,000,608 (the “'608 patent”) because it is invalid. Asserted claims 57 and 58 disclose nothing more than an abstract idea for making a business run more efficiently, thereby failing to meet the subject matter eligibility requirements set forth in 35 U.S.C. § 101.
Whether claims are directed to statutory subject matter is a “threshold” question, Bilski v. Kappos, — U.S.-, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010), which must be addressed before this court can consider subordinate issues related to obviousness and infringement. See Parker v. Flook, 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“Flook”) (emphasizing that “[t]he obligation to determine what type of discovery is sought to be patented” so as to determine whether it falls within the ambit of section 101 “must precede the determination of whether that discovery is, in fact, new or obvious” (emphasis added)); In re Comiskey, 554 F.3d.967, 973 (Fed. Cir,2009) (“Only if the requirements of § 101 are satisfied is the inventor allowed tq pass through to the other requirements for patentability, such as novelty under § 102 and ... non-obviousness under § 103.” (citations and internal quotation marks omitted)). The '608 patent falls outside the ambit of section 101 because it discloses no “inventive concept,” Mayo Collaborative Servs. v. Prometheus Labs., Inc., -U,S. -, 132 S.Ct. 1289, 1294, 182 L.Ed.2d 321 (2012) (citations and internal quotation marks omitted), that would even arguably confer subject matter eligibility.
The '608 patent is directed to a system for activating gift and pre-paid telephone cards at the time that they are purchased. In the past, retailers often installed dedicated “activation terminals” in their stores in order to activate such cards. Robert Dorf, the named inventor on the '608 patent, decided that the activation process could be made more efficient and less expensive 'if gift and pre-paid telephone cards could be activated using the point-of-sale terminals that are commonly used for processing credit card transactions. Thus, *1349 instead of activating a card by swiping it through a dedicated activation terminal, a store employee could simply swipe it through the terminal used for processing credit card transactions.
Significantly, the '608 patent makes clear that no new technology is required in order to allow standard point-of-sale devices to activate gift and pre-paid telephone cards. To the contrary, claim 57 recites that the cards can be activated using “unmodified existing standard retail point-of-sale device[s].” '608 patent col.18 11.42-43 (emphasis added). During prosecution, Dorf asserted that his claimed system allowed cards to be activated using the “ubiquitous existing banking network” and that no “custom software” was required. J.A. 16981. Dorf emphasized that the “great benefit” of his system over the prior art was that existing point-of-sale devices could be used to activate cards with “no additional programming.” Id. Accordingly, the trial court’s claim construction — which was agreed to by all parties — requires use of a terminal “that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system.” J.A. 14822.
This appeal thus presents the anomalous situation in which a patentee attempts to preserve the validity of his claims by arguing that they contain nothing new.* Instead, the “great benefit,” J.A. 16981, of the '608 patent is that it discloses no new hardware or software, but instead relies on the use of unmodified existing terminals for activating gift and pre-paid telephone cards. In essence, the '608 patent discloses nothing more than the “abstract idea” that it is less expensive and more efficient to activate pre-paid cards on the point-of-sale devices used to process credit cards.
“[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.” Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A patentee does not uphold his end of this bargain if he seeks broad monopoly rights over a fundamental concept or basic idea without a concomitant contribution to the existing body of scientific and technological knowledge. In Bilski, an application was rejected as patent ineligible because it did not “add” anything to the basic concept of hedging against economic risk. 130 S.Ct. at 3231 (emphasizing that the application applied the concept of hedging using “well-known random analysis techniques”). In Mayo, likewise, process claims were invalidated under section 101 because they simply described a law of nature and applied *1350 it using “well-understood, routine, [and] conventional” means. 132 S.Ct. at 1294. A similar analysis applies here. The asserted claims of the '608 patent fall outside section 101 because they simply describe the idea that it would be less expensive to use the terminals that are already present in retail locations to activate gift and prepaid telephone cards, and then apply that idea using existing technology. See Bilski, 130 S.Ct. at 3230 (“[T]he prohibition against patenting abstract ideas ‘cannot be circumvented by’ ... adding ‘insignificant postsolution activity.’ ” (quoting Diamond v. Diehr, 450 U.S. 175, 191-92, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981))); Flook, 437 U.S. at 590, 98 S.Ct. 2522 (rejecting “[t]he notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process”).
The analysis of subject matter eligibility under section 101 often turns on the extent to which a patentee seeks to preempt future use of a fundamental concept or basic idea. See Mayo, 132 S.Ct. at 1294 (concluding that claims failed to disclose statutory subject matter where “upholding the patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further . discoveries”); Bilski, 130 S.Ct. at 3231 (“Allowing petitioners to patent risk hedging would preempt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea.”). Here, the asserted claims disclose no new technology, and yet have the potential to wield enormous preemptive power.** Alexsam, Inc. (“Alexsam”) has filed suit against a wide array of merchants, seeking damages for infringement whenever a conventional or online retailer uses the existing banking network to process gift and other prepaid cards. See, e.g., Alexsam, Inc. v. Best Buy Stores L.P., No. 2:10CV93, 2012 U.S. Dist. LEXIS 49511, at *8-9 (E.D. Tex. April 9, 2012) (describing Alexsanfs claims against parties such as Barnes & Noble, Inc., The Gap, Inc., J.C. Penney Company, Inc., McDonald’s Corporation, Best Buy Stores LP, and The Home Depot, U.S.A., Inc.). Alexsam’s broad claims — which cover not only gift cards and prepaid telephone cards, but also customer “loyalty” cards and “medical information” cards — threaten to preempt some of the “basic tools” of modern commerce. See Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) (“Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.”); see also Bilski, 130 S.Ct. at 3229 (“If a high enough bar is not set when considering [business method] patent applications ..., patent examiners and courts could be flooded with claims that would put a chill on creative endeavor and dynamic change.”).
The '608 patent, like the application seeking patent protection for a method of hedging against risk in Bilski, 130 S.Ct. at 3230-31, describes an idea for making business fun more efficiently, but it does not disclose any technological advance sufficient to confer patent eligibility. Because the asserted claims “simply append[ ] conventional steps” to an otherwise abstract idea, they fall outside the ambit of section 101. Mayo, 132 S.Ct. at 1300 (“[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable.”); see also Flook, 437 U.S. at 594, 98 S.Ct. 2522 (concluding that claims were barred by *1351 section 101 where they described an algorithm, but disclosed no “inventive concept in its application”).

 At the time of Dorf s application, existing point-of-sale terminals were pre-programmed to read bank identification numbers (''BINS”) associated with different card-issuing institutions. J.A. 13464-71; 14504. Dorf simply added BINS to gift and pre-paid telephone cards, thereby allowing them to be read by “unmodified existing standard retail point-of-sale device[s].” '608 patent col. 18 11. 35-43; see J.A. 13466. The practice of encoding various types of cards with identification numbers for processing by banks and other card-issuing institutions was well-known in the art at the time Dorf filed his application. See U.S. Patent No. 5,477,038 ("The card has a magnetic stripe with an encoded card number including a bank identification number (BIN) and an account number.”); see also U.S. Patent No. 6,270,012 col. 5 11. 10-15 (describing a debit card which functions as a prepaid telephone card and which contains a magnetic stripe that is swiped through "well-known magnetic stripe reading equipment ... common in retail establishments for credit card transactions"). Indeed, Alexsam’s expert, Robert Baker, conceded that every element of claims 57 and 58 was already in the prior art or "available in the industry” prior to the effective filing date of the '608 patent. J.A. 14738-42.

 The '608 patent covers a broad range of point-of-sale devices, including a card swipe device, a cash register, and a computer terminal. '608 patent col.4 ll.28-35.